FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jul 09, 2025

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

VITTORIA P.,[1]

                    Plaintiff,

        v.

FRANK BISIGNANO,
Commissioner of Social Security,

                    Defendant.

No.   2:25-cv-00010-EFS

**ORDER AFFIRMING THE ALJ'S DENIAL OF BENEFITS**

Due to bipolar disorder, depression, anxiety, obsessive compulsive disorder (OCD), panic attacks, and migraine headaches, Plaintiff Vittoria P. claims that she is unable to work fulltime and applied for disability benefits and supplemental security income benefits. She

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

DISPOSITIVE ORDER - 1

appeals the denial of benefits by the Administrative Law Judge (ALJ) on the grounds that the ALJ improperly analyzed the opinions of treating source Shannon Rowland, PMHNP, and failed to resolve conflicts between the vocational expert testimony and the Dictionary of Occupational Titles at step five. As is explained below, Plaintiff has not established any consequential error. The ALJ's denial of benefits is affirmed.

## I.    Background

In November 2021, Plaintiff filed applications for benefits under Title 2 and Title 16, claiming disability beginning August 21, 2021, based on the physical and mental impairments noted above.[2] Plaintiff's claims were denied at the initial and reconsideration levels.[3]

After the agency denied Plaintiff benefits, ALJ Marie Palachuk held a telephone hearing in August 2023, at which Plaintiff appeared

---

[2] AR 310-311, 364.

[3] AR 107, 112, 119, 122.

with her representative.[4]  Plaintiff, a medical expert, and a vocational expert testified.[5]

After the hearing, the ALJ issued a decision denying benefits.[6] Plaintiff appealed ALJ Palachuk's decision to the Appeals Council, and the Appeals Council denied her request for review.[7] Plaintiff filed suit in this Court and on January 2, 2024, this Court remanded the case for further proceedings on stipulation of the parties.[8]  Pursuant to the Court's order the Appeals Council remanded the case to ALJ Palachuk.[9]

On September 19, 2024, ALJ Palachuk held a second hearing, which Plaintiff attended with her representative.[10] Plaintiff and a

_____

[4] AR 41-68.

[5] *Id.*

[6] AR 14-40, 1623-1649.

[7] AR 1-6, 1650-1655.

[8] AR 1656-1662.

[9] AR 1663-1668.

[10] AR 1605-1622.

vocational expert testified.[11] On October 11, 2024, ALJ issued a second decision denying benefits.[12]

The ALJ found Plaintiff's alleged symptoms were not entirely consistent with the medical evidence and the other evidence.[13] As to medical opinions, the ALJ found:

- The opinions of medical expert Laura Hopper, PhD, to be very persuasive.

- The opinions of state agency evaluators Jonathan Anderson, PhD, and Vincent Gollogly, PhD, to be partially persuasive.

- The opinions of consultative examiner Rebecca Alexander, PhD, to be not persuasive.

- The opinions of state agency evaluators Mark Magdaleno, MD, and Glenn Gade, MD, to be not persuasive.

---

[11] *Id.*

[12] AR 1565-1595. Per 20 C.F.R. §§ 404.1520(a)-(g); 416.920(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[13] AR 1576-1580.

- The opinions of treating source Shannon Rowland, PMHNP, to be not persuasive.[14]

The ALJ also considered the third-party statement of Plaintiff's brother and found that it was inconsistent with Plaintiff's own accounts of her activities of daily living.[15] As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff meets the insured status requirements through March 31, 2026, and had not engaged in substantial gainful activity since August 21, 2021, the amended alleged onset date.

- Step two: Plaintiff had the following medically determinable severe impairments: bipolar vs depressive disorder, anxiety, and migraines.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

---

[14] AR 1580-1583.

[15] AR 1582.

- RFC:  Plaintiff had the RFC to perform a full range of work at all exertional levels with the following exceptions:

  Due to migraine headaches, she needs to avoid more than moderate exposure to industrial noise, industrial vibration, very bright lights (defined as lights brighter than standard fluorescent office lighting) and hazards, such as unprotected heights and dangerous moving machinery. She is able to understand, remember, and carry out simple routine tasks and maintain concentration, persistence, and pace on simple routine tasks for two-hour intervals between regularly scheduled breaks. She needs a predictable environment with no assembly-line pace or similarly fast paced work. She should have no public contact, no crowds and occasional interaction with coworkers and supervisors. She should be dealing with things rather than people.

- Step four: Plaintiff is unable to perform her past relevant work as an administrative clerk.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as a change house attendant (DOT 358.687-010), marker (DOT

209.587-034), and small products assembler (DOT 706.684.022 ).[16]

Plaintiff timely filed suit in this Court.[17]

## II.     Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error,"[18] and such error impacted the nondisability determination.[19] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such

---

[16] AR 1570-1585.

[17] ECF No. 1.

[18] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

[19] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[20]

## III.   Analysis

Plaintiff seeks relief from the denial of disability on two grounds. She argues the ALJ erred when evaluating the medical opinions and when evaluating Plaintiff's subjective complaints regarding her mental impairments.  As is explained below, the Court concludes that Plaintiff fails to establish the ALJ erred in her evaluation of the medical opinion evidence, the listings, or Plaintiff's symptom reports.

---

[20] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

### A. Medical Opinion: Plaintiff fails to establish consequential error.

Plaintiff argues the ALJ erred in her evaluation of the medical opinion of PMHNP Rowland.[21]  Specifically, Plaintiff argues that the ALJ erred in reasoning that the extreme degree of limitation described by PMHNP Rowland was inconsistent with the predominantly normal mental status findings in the record and also erred both in considering PMHNP Rowland's relatively short treatment history and that her own treatment notes reflected that Plaintiff's condition was well-controlled.[22]  Plaintiff argues that the ALJ cherry-picked relatively normal findings while ignoring notes of an anxious or depressed affect and reports of ongoing panic attacks.[23]  The Commissioner counter-

---

[21] An ALJ must consider and articulate how persuasive she found each medical opinion, including whether the medical opinion was consistent with and supported by the record. 20 C.F.R. §§ 416.920c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

[22] ECF No. 8.

[23] *Id*.

argues that the ALJ considered the record in its entirety and properly considered both the supportability and consistency factors.[24]

1.    Standard

The ALJ was required to consider and evaluate the persuasiveness of the medical opinions and prior administrative medical findings.[25] The factors for evaluating the persuasiveness of medical opinions and prior administrative medical findings include, but are not limited to, supportability, consistency, relationship with the claimant, and specialization.[26] Supportability and consistency are the most important factors,[27] and the ALJ must explain how she considered the supportability and consistency factors when reviewing the medical opinions and support her explanation with substantial

---

[24] ECF No. 9.

[25] 20 C.F.R. §§ 404.1520c(a), (b); 416.920c(a), (b).

[26] 20 C.F.R. §§ 404.1520c(c)(1)-(5); 416.920c(c)(1)–(5).

[27] Id. §§ 404.1520c(b)(2); 416.920c(b)(2).

evidence.[28] The ALJ may consider, but is not required to discuss the following additional factors: the source's relationship to Plaintiff such as length of the treatment, purpose of the treatment relation and whether the source examined Plaintiff, as well as whether the source had advanced training or experience to specialize in the area of medicine in which the opinion was being given.[29] When considering the ALJ's findings, the Court is constrained to the reasons and supporting explanation offered by the ALJ.[30]  An ALJ is not required to articulate

---

[28] *Id.* §§ 404.1520c(b)(2); 416.920c(b)(2); *Woods v. Kijakazi*, 32 F.4th a at 785 ("The agency must articulate . . . how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings.") (cleaned up).

[29] *Id.*

[30] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (recognizing court review is constrained to the reasons the ALJ gave).

how they considered evidence from nonmedical sources using the

requirements in paragraphs (a) through (c).[31]

2.  <u>PMHNP Rowland's Opinions</u>

On August 27, 2024, PMHNP Rowland completed a medical

source statement.[32] She said that she had been seeing Plaintiff on a

monthly or bi-monthly basis and that she had bipolar disorder,

generalized anxiety disorder and obsessive-compulsive disorder.[33] She

opined that Plaintiff has a poor prognosis and that Plaintiff has had

improvement with medication but may struggle for her life and that

she had reported auditory hallucinations on several occasions, and

struggles with paranoia and intrusive thoughts.[34]

PMHNP Rowland wrote that Plaintiff's symptoms included

anhedonia, decreased energy, feelings of guilt, generalized anxiety,

mood disturbance, intrusive thoughts, paranoia, obsessions, emotional

---

[31] 20 C.F.R. §§ 404.1520c(d); 416.920c(d)

[32] AR 2579-2584.

[33] AR 2579.

[34] *Id*.

withdrawal, episodes of mania or depression, unstable relationships, hallucinations, easy distractibility, and sleep disturbance.[35]

PMHNP Rowland opined that Plaintiff would be seriously limited in the following abilities: remember work-like procedures, understand and remember short and simple instructions, carry out short and simple instructions, sustain a routine without supervision, work in coordination with others, make simple work-like decisions, ask simple questions, accept instructions from supervisors, be aware of hazards, understand and remember detailed instructions, set realistic goals, travel in unfamiliar places and use public transportation.[36]

PMHNP Rowland opined that Plaintiff would be unable to meet competitive standards in the following abilities: maintain attention for a two-hour segment, maintain regular attendance and punctuality, complete a normal workday or workweek without interruption, perform at a consistent pace, get along with co-workers, deal with normal work

---

[35] AR 2580.

[36] AR 2581-2582.

stress, carry out detailed instructions, and deal with the stress of skilled or semiskilled work.[37]

PMHNP Rowland wrote:

I believe that [Plaintiff] due to her anxiety, history of trauma, and paranoia would be overwhelmed in a working environment. She would have increased distractibility, attentional lapses, and poor concentration. The anxiety will limit her working memory which will make it harder to perform goal-directed tasks. Her anxiety would inhibit her executive functioning ability and ability to retain information, reduces flexibility in thinking, error detection, impairs working memory and causes brain fog.[38]

She wrote that Plaintiff did not have a low IQ and that she suffered from migraine headaches that would cause fatigue, nausea, and frequent absences.[39] PMHNP Rowland further opined that Plaintiff would be expected to be absent for more than four days a month, and that her condition had lasted or would last for more than 12 months.[40] PMHNP Rowland wrote that stress would cause Plaintiff'

---

[37] *Id.*

[38] AR 2582.

[39] *Id.*

[40] AR 2583.

to suffer from frequent migraines, and added that she suffered sleep apnea that also caused headaches, fatigue, impaired memory, and poor immune function.[41] PMHNP Rowland also opined that Plaintiff's impairments were not the result of alcohol or substance abuse.[42]

### 3.    Relevant Medical Records

On September 16, 2021, Plaintiff was admitted to St. Joseph Regional Medical Center after presenting to the emergency department with "rapidly cycling panic attacks".[43] Plaintiff reported that after starting Topamax for headaches she lost 70 pounds and began having racking thoughts.[44] Plaintiff was grandiose and had poor insight and judgment, and reported rapidly cycling panic attacks for the last 2

---

[41] *Id.*

[42] AR 2584.

[43] AR 519.

[44] *Id.*

months.[45] Plaintiff was discharged on September 21, 2021, after increase in her medication stabilized her condition.[46]

On September 29, 2021, Plaintiff presented to Melissa Park, MD, for follow-up for anxiety and depression.[47] She reported that her anxiety and depression were interfering with her relationships, household activities, and work but had a good prognosis if she took her medication.[48] On mental status examination, she had good judgment, normal affect and mood, was alert and active, was oriented, and had normal recent and remote memory.[49] Dr. Park assessed bipolar disorder, chronic depression, and anxiety.[50]

---

[45] *Id.*

[46] AR 519-520.

[47] AR 647.

[48] *Id.*

[49] AR 648.

[50] *Id.*

On August 15, 2023, Plaintiff first met with Shannon Rowland, PMHNP, for consult.[51] Plaintiff reported that she had been seeing another provider but the provider did not support her disability application.[52] Plaintiff reported she last had a manic episode in 2022 before she started her current medication and that she had been hospitalized in March/April 2023 for suicidal thoughts.[53] Plaintiff reported social anxiety, panic attacks once or twice a week, and symptoms of OCD.[54] Plaintiff's mental status examination was normal other than an anxious affect and reports that she hears bells chiming.[55] PMHNP Rowland noted the following:

> Pt reported she primarily would like to see a new medication manager to manage her medication's. She reported she likes the medications she is currently on, however, she would like to transfer care from her current provider due to "feeling afraid of her" and feeling she "doesn't trust her." Pt reports overall feeling "stable" however, currently is experiencing

---

[51] AR 2527.

[52] AR 2532.

[53] *Id.*

[54] *Id.*

[55] AR 2534.

anxiety due to current life stressors. Pt reported she has a history of panic attacks, however, with her current medications she has them "pretty infrequent" any more. Pt reports having a disability hearing next week, which is increasing her feelings of anxiety. In addition, pt would like to see a therapist.[56]

At an August 23, 2023 appointment with ARNP Jennifer Anderson, Plaintiff had normal mood, affect, behavior, judgment, and thought content and reported that she was "doing well," sleeping well and had an appointment scheduled for September 11, 2023, with a behavioral specialist.[57]

On September 11, 2023, Plaintiff presented to Katherine Johnson, LMSW, for a treatment assessment.[58] She reported that with her new medication she felt like herself.[59] Her mental status

---

[56] AR 2550.

[57] AR 2525.

[58] AR 2500.

[59] AR 2505.

examination was normal, and she reported that her symptoms had a moderate impact on her daily functioning.[60]

On September 12, 2023, Plaintiff reported she was anxious about her disability claim but was doing well and denied irritability but reported she almost had a panic attack the week prior.[61]  On mental status exam, Plaintiff reported a "sleepy" mood and said she heard bells chiming.[62] On September 18, 2023, Plaintiff reported she was "doing well," and her mental status exam was normal.[63] At her October 9, 2023 appointment, Plaintiff reported she was completing her daily activities despite feeling low motivation.[64] Her mental status examination was normal.[65]

---

[60] AR 2507-2508.

[61] AR 2495.

[62] *Id.*

[63] AR 2483-2484.

[64] AR 2438.

[65] *Id.*

At her October 30, 2023 appointment, Plaintiff reported that she had organized a haunted hayride event for her family and successfully dealt with the stress, although she had one panic attack.[66] Her mental status examination was normal.[67]

At her November 14, 2023 appointment, Plaintiff reported that she was under stress because her dog had cancer and she did not get her state assistance, but that her mood was stable.[68] Her mental status examination was again unremarkable.[69]

At her November 30, 2023 appointment, Plaintiff appeared and reported stress due to situational reasons when her state assistance was placed on hold.[70] PMHNP Rowland noted:

> Today in session Vittoria reflected on the past week and the current stressors she is experiencing. Vittoria was extremely overwhelmed and tearful during todays appointment. It appears that Vittoria has been

---

[66] AR 2399.

[67] *Id.*

[68] AR 2373.

[69] AR 2383.

[70] AR 2347.

catastrophizing over the past week about several stressors. She was able to speak through some recent health issues, her financial and living situation, and some family stressors she is taking on. We talked about how things seem "very out of control" and we spoke about focusing on one thing at a time. We spoke about setting a timer to pick up her home for 10 minutes and she feels that is doable. She reported she has a selfcare journal her CSAP advocate gave her and she would like to work a little in it, we spoke about doing a little at a time, to not be so overwhelming. We spoke about showering more frequently as she has not showered in 5 days and we spoke about what an attainable goal would be. She was able to get things out and was able to then focus on solutions and steps to take towards the end of session. Vittoria reported "feeling much better" at the end of the appointment.[71]

Plaintiff's affect was sullen, flat, and tearful and she had racing thought at the beginning of the appointment but by the end of the appointment her racing thoughts were improved.[72]

At her December 13, 2023 appointment, Plaintiff reported that she was doing well and had handled the stress of moving recently.[73] On December 28, 2023, Plaintiff also reported to PMHNP Rowland that

---

[71] *Id.*

[72] AR 2348.

[73] AR 2317.

she was handling the stress of the holidays well.[74] Her mental status examination findings were unremarkable.[75]

At her January 8, 2024 appointment, with PMHNP Rowland, Plaintiff's mental status examination was largely normal.  PMHNP Rowland found the following:

> Appearance: well-groomed, clean, and normal station. Behavior: cooperative and calm. Eye Contact within normal limits. Motor Activity: within normal limits. Features of Speech: fluent, clear, reciprocal, and normal volume. Mood: patient's stated mood "mostly good". Affect: full-range and congruent to mood. Perception / Hallucinations none. Cognition: oriented to situation, time, place, and person and alert and memory grossly intact. Thought Processes: linear and goal-directed. Thought Content: unremarkable. Attention/Concentration: sustained and appropriate for age. Language Skills expressive language within normal limits and receptive language within normal limits. Insight: grossly intact. Judgment: grossly intact.[76]

When seen in February 2024, Plaintiff's mental status examination was unremarkable.[77] Plaintiff reported that she was doing

---

[74] AR 2308.

[75] AR 2304.

[76] AR 2283.

[77] AR 2214-2215, 2223, 2232-2233.

well and working on quitting smoking.[78]  In March 2024, Plaintiff reported that she was happy where she was at and had not been hospitalized for a year.[79] Her mental status examination was normal.[80] PMHNP Rowland noted:

> Today in session Vittoria reflected on the past week and getting her mom moved, and her apartment cleaned. Pt reported her motivation is "better" and that she has been pretty active over the past week. She reported she did accomplish things she has been wanting to do. She reported she is getting some crafts made which has been good as well. Today we spoke about stress management while getting her mom moved and how to motivate her family to help.[81]  Earlier in March Plaintiff had reported good motivation and that she had read 3 books and completed creative projects.[82]

At her May 20, 2024 appointment, it was noted that Plaintiff's mental status examination was unremarkable she had not had a self-

---

[78] AR 2232.

[79] AR 2165.

[80] AR 2165-2166.

[81] AR 2196.

[82] AR 2205.

harm thought in a "significant time."[83] At her June 17, 2024

appointment, Plaintiff reported her anxiety and depression have been

maintained.[84] Her mental status examination findings were

unremarkable.[85]

On July 1, 2024, Plaintiff's mental status examination findings

were as follows:

> Appearance: well-groomed, clean, and normal station.
> Behavior: cooperative and calm. Eye Contact within normal
> limits. Motor Activity: within normal limits. Features of
> Speech: fluent, clear, reciprocal, and normal volume. Mood:
> euthymic and patient's stated mood "--". Affect: full-range
> and congruent to mood. Perception / Hallucinations none.
> Cognition: oriented to situation, time, place, and person and
> alert and memory grossly intact. Thought Processes: linear
> and goal-directed. Thought Content: unremarkable.
> Attention/Concentration: sustained and appropriate for age.
> Language Skills expressive language within normal limits
> and receptive language within normal limits. Insight:
> grossly intact. Judgment: grossly intact.[86]

---

[83] AR 2085.

[84] AR 2052.

[85] *Id.*

[86] AR 2032.

DISPOSITIVE ORDER - 24

1

2

3

On July 24, 2024, Plaintiff was seen by PMHMP Rowland in a telehealth visit.[87] Plaintiff reported excessive worry, irritability, depressed mood, and anergy.[88] Ms. Rowland noted:

4

5

6

7

8

9

10

11

> Vittoria is a 42-year-old female with the diagnoses of chronic depression, anxiety, bipolar disorder, OCD, and insomnia. Vittoria is here for a follow-up appointment for medication management. She states that things aren't going to bad. She has been feeling pretty steady. She feels the same since increasing the lithium. She will be going in to complete a new lithium level due to the increase. She has been sleeping pretty good. She is getting the normal amount for her. She is going to be getting a CPAP. She will also be having surgery on her nose because it is narrow and collapses. She denies SI or HI. She denies paranoia or hallucinations. She had COVID last month but she is okay. It was more like a bad cold. She denies manic behaviors.[89]

12

13

14

15

16

17

18

Mental status examination findings were: "Appearance: well-groomed, clean, and normal station. Behavior: cooperative and calm. Eye Contact within normal limits. Motor Activity: within normal limits. Features of Speech: fluent, clear, reciprocal, and normal volume. Mood: patient's stated mood "Steady". Affect: full-range and congruent to mood.

19

20

[87] AR 1998.

21

[88] AR 2003.

22

[89] AR 2004.

23

Perception / Hallucinations none. Cognition: oriented to situation, time, place, and person and alert and memory grossly intact. Thought Processes: linear and goal-directed. Thought Content: unremarkable. Attention/Concentration: sustained and appropriate for age. Language Skills expressive language within normal limits and receptive language within normal limits. Insight: grossly intact. Judgment: grossly intact."[90]

Ms. Rowland made the following findings: "Generalized anxiety disorder - Generalized Anxiety Disorder F41.1 evidenced by her excessive anxiety and worrying occurring for over 6 months about multiple different events of activities and difficulty controlling the worry with restlessness or feeling keyed up/on edge, easily fatigued, difficulty concentrating or mind going blank, she struggles with irritability and take trazodone to help with her sleep disturbance. These symptoms are causing significant distress and impairment in: social, occupational and other important areas of functioning. She is not able to work and has applied for disability. F41.1: Generalized

---

[90] *Id.*

anxiety disorder 3. Bipolar I disorder - Her last manic episode was 2022 before she was on her current medication. She still struggles with depression. She states that when she has a manic episode she becomes hyper and confrontational, and she has reckless behavior towards herself and other. She will have an inflated self-esteem. When she becomes manic, her anxiety goes through the roof. F31.9: Bipolar disorder, unspecified."[91]

4.    Analysis

a.    *The ALJ's consideration of the opinions of Dr. Brooks*

The ALJ gave the following reasoning as to her consideration of PMHNP Rowland's opinions:

> The Medical Source Statement provided by provider Shannon Rowland, PMHNP, dated August 27, 2024, is not persuasive. (Ex. 24F). This provider reports that she has seen the claimant since August 15, 2023, on a monthly or bimonthly basis for medication management. Ms. Rowland identifies a variety of symptoms, all consistent with the claimant's severe impairments, and opines the claimant is seriously limited, defined as having noticeable difficulty for 11 to 20% of the workday or workweek, in the abilities to remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; sustain an ordinary routine without

---

[91] AR 2005.

special supervision, work in coordination with or proximity to others; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism; and be aware of normal hazards and take appropriate precautions. (Ex. 24F/3). She opines the claimant is unable to meet competitive standards defined as having noticeable difficulty from 21 to 40% of the workday or workweek, in the ability to maintain attention for two hour segments; maintain regular attendance and be punctual within customary, usually strict tolerances; complete a normal workday or workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; and dealing with normal work stress. (Ex. 24F/3). She reports that the claimant's anxiety, history of trauma, and paranoia, would cause the claimant to be overwhelmed in a working environment. (Ex. 24F/4). She reports the claimant would have increased distractibility, lapses in attention, and poor concentration, and anxiety would limit her working memory. (Ex. 24F/4). She additionally reports excessive absenteeism (more than four days per month), problems with executive functioning, information retention, and brain fog. (Ex. 24F/4). This degree of limitation is not only inconsistent with evidence of predominantly normal memory function, cognition, behavior, insight, and mood, but is unsupported by the short amount of time Ms. Rowland has treated the claimant. Ms. Rowland reports that she began caring for the claimant on August 15, 2023, but the claimant has alleged disability since August of 2021. There is a significant amount of time this provider cannot personally form an opinion on. Ms. Rowland typically states the claimant's conditions are well-managed (Ex. 23F/17) and she reports objective findings that are normal, and not consistent with her significant limitations. (Ex. 23F/26, 38, 54, 64, 74, 98, 107). Nor are

these limitations consistent with moderate findings made by Dr. Alexander or Dr. Hopper.[92]

Plaintiff argues that the ALJ erred in reasoning that PMHNP Rowland was not able to make a reasoned opinion as to the period prior to her treating Plaintiff and that both the ALJ's consistency and supportability analysis are flawed.

The Court agrees with Plaintiff that a qualified medical expert is not limited in rendering an opinion as to a patient's opined limitations to the period for which the medical source has personally treated the patient.  The Court agrees with the Commissioner, however, that the ALJ properly considered the consistency and supportability factors.

The Court thus concludes that Plaintiff failed to establish consequential error in the ALJ's consideration of PMHNP Rowland's testimony.

b. *The ALJ's consideration of the time period in which PMHNP Rowland treated Plaintiff*

---

[92] AR 1583.

As noted above, the ALJ erred in her reasoning that because the alleged disability onset date preceded the date that PHMNP Rowland first treated Plaintiff she was unable to "personally form an opinion."[93]

There is no precedent for the ALJ's reasoning.  While the Court is aware of cases in which it has been difficult to obtain a medical source opinion for periods of time for Plaintiff had no treatment records, this is not the case here.  There were records in evidence and in PMHNP Rowland's treatment record reflecting treatment at St. Joseph's Medical Center in both 2021 and 2022.  The Commissioner offers no reason that PMHNP Rowland would not have been able to review those records and form an opinion based upon those records.

The ALJ found that the opinions of Dr. Hopper, who never treated Plaintiff were very persuasive and also found the opinions of state agency consultants Dr. Anderson and Dr. Gollogly to be partially persuasive and they also never treated or personally examined Plaintiff.

---

[93] *Id.*

c.    *The ALJ's consideration of the supportability and consistency factors*

Plaintiff argues that the ALJ erred in her supportability and consistency analysis regarding PMHNP Rowland's opinions. She asserts that the ALJ erred in focusing on normal findings not relevant to the limitations endorsed, and by ignoring other findings such as anxious or depressed affect and reports of panic attacks. The Court has reviewed the record as a whole and finds that this argument is not well-supported.

While there are instances in the record in which it was noted that Plaintiff had an inappropriate affect,[94] those treatment notes indicated that Plaintiff reported that even with situational stressors in her life her medication had made her panic attacks "infrequent" and the rest of her mental status examination was normal, with normal mood, behavior, judgment, and thought content.[95] The ALJ did not "cherry-pick" normal mental status findings, as Plaintiff alleges, because

---

[94] AR 2534.

[95] *Id.*

PMHNP Rowland's finding on mental status examinations were predominantly within normal limits and unremarkable, as detailed above.

Moreover, it was Plaintiff's statement when she first initiated treatment with PMHNP Rowland that she was seeking a new medical source because her prior psychiatrist did not support her application for disability.[96]

In September 2021, Plaintiff was assessed by Dr. Park as having good judgment, normal affect and mood, being alert and active, being fully-oriented and having normal recent and remote memory.[97] In August 2023, when seen by ARNP Anderson, Plaintiff had normal mood, affect, behavior, judgment, and thought content and reported that she was "doing well."[98]  In September 2023, LMSW Johnson noted that Plaintiff's mental status examination was normal and she reported that her symptoms had only a moderate impact on her daily

---

[96] AR 3532.

[97] AR 648.

[98] AR 2525.

functioning.[99]  In the fall of 2023, Plaintiff reported that she was successfully dealing with stress despite multiple situational stressors, and she had normal findings on mental status examinations.[100]

When read in context, the ALJ gave a detailed statement as to findings in the medical record which she felt were inconsistent with PMHNP Rowland's opinion.  Viewed in that context, the Court does not find the ALJ's reasoning to be deficient.

     5.   <u>Summary</u>

Because the ALJ committed no error in her consideration of the opinions of PMHNP Rowland, the Court finds that no consequential error occurred and a remand is not warranted as to this issue.

**B.   Step Five: Plaintiff fails to establish consequential error**

Plaintiff argues the ALJ's step five finding is flawed because the ALJ failed to properly perform a function-by-function analysis of Plaintiff's RFC.  She argues that the ALJ erred in finding that she was

---

[99] AR 2507-2508.

[100] AR 2482, 2399.

able to perform three jobs cited by the VE because she did not question or resolve conflicts between the specific jobs cited and the RFC.

### 1.    Standard

At step five, the ALJ has the burden to identify specific jobs existing in substantial numbers in the national economy that claimant can perform despite their identified limitations.[101] At an administrative hearing, an ALJ may solicit vocational expert testimony as to the availability of jobs in the national economy.[102] A vocational expert's testimony may constitute substantial evidence of the number of jobs that exist in the national economy.[103] The ALJ's decision regarding the number of alternative occupations must be supported by substantial evidence.[104]

---

[101] *Johnson v. Shalala*, 50 F.3d 1428, 1432 (9th Cir. 1995). *See* 20 C.F.R. § 404.1520(g).

[102] *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 2011).

[103] *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).

[104]*Farias v. Colvin*, 519 F. App'x 439, 440 (9th Cir. 2013) (unpublished). *See Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

At step five, the ALJ considers the claimant's background and RFC, along with the testimony of the vocational expert, to decide whether the claimant can perform available jobs notwithstanding his functional limitations.[105] If the vocational expert's "opinion that the applicant is able to work conflicts with, or seems to conflict with, the requirements listed in the *Dictionary*, then the ALJ must ask the expert to reconcile the conflict before relying on the expert to decide if the claimant is disabled":[106]

> For a difference between an expert's testimony and the *Dictionary's* listings to be fairly characterized as a conflict, it must be obvious or apparent. This means that the testimony must be at odds with the *Dictionary's* listing of job requirements that are essential, integral, or expected. This is not to say that ALJs are free to disregard the *Dictionary's* definitions or take them with a grain of salt—they aren't. But tasks that aren't essential, integral, or expected parts of a job are less likely to qualify as apparent conflicts that the ALJ must ask about. Likewise,

---

[105] 20 C.F.R. §§ 404.1520(g), 404.1560(c); *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999); *Hill*, 698 F.3d at 1161.

[106] *Gutierrez v. Colvin,* 844 F.3d 804, 807 (9th Cir. 2016).

where the job itself is a familiar one—like cashiering—less scrutiny by the ALJ is required.[107]

The ALJ—and the reviewing court—are to consider not only the *Dictionary* and SCO, but also common experience, to determine whether there is an apparent conflict.[108]

### 2.    The Vocational Expert's Testimony

The following exchange took place on the record between the vocational expert (VE) and the ALJ:

> BY ADMINISTRATIVE DAW JUDGE:
> Q: So, Mr. Harrington, we don't need to go through that then. We'll just move directly to a hypothetical. Please assume an individual with the same age, education, and work experience as the claimant. Having been born in 1981,

---

[107] *Id.* at 808; *see also* SSR 00-4p ("When a [vocational expert] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [vocational expert] . . . evidence and information provided in the [*Dictionary*].").

[108] *Lamear v. Berryhill*, 865 F.3d 1201, 1205–06 (9th Cir. 2017); *see also* SSR 00-4p (requiring the ALJ to consider the *Dictionary* and SCO); SSR 83-14 (referencing the *Dictionary* and SCO)

she falls within the younger regulatory category and with her GED, she would fall in the high school and above educational category. The individual would have the following functional Limitations. There would be no exertional limitations, However, due to migraine headaches, the individual would need to avoid more than moderate exposure to industrial noise, vibration, hazards such as unprotected heights and dangerous moving machinery and very bright lights. And I define very bright lights as lights which are brighter than standard fluorescent office lighting. The individual is able to understand, remember, and carry out simple, routine, tasks. Can maintain concentration, persistence and pace for the two-hour intervals between regularly scheduled breaks. Needs a predictable environment, there should be no assembly line pace or similarly fast paced work. There should be no public. Only occasional interaction with coworkers and supervisors. No crowds. The individual should be dealing with things rather than people. Would such an individual be able to perform the claimant's past work as an admin clerk?

A: No, I would rule that job out given the public, simple routine, and there was another one you mentioned, Your Honor, but for those two reasons at least, I would rule out the past work.

Q: Are there other jobs that exist in the national economy that such an individual could perform?

A: Yes. let me give you some examples. At the medium level of unskilled work, one example is a janitor, DOT code is 358.687-010, medium, unskilled, with an SVP of 2. This specific DOT estimate is 63,000. At the light level of unskilled work -- let me see -~- one would be a price marker, DOT code is 209,587-034, Light, unskilled with an SVP of 2. The DOT estimate is 165,000, And a third example at the Light level is -- or second example at the Light Level, but third example, would be a small products I assembler. DOT

code is 706.684-022, light, unskilled with an SVP of 2. DOT
estimate is 20,300.

Q: And Mr. Harrington, I know that many of the items that
I included in my hypothetical are not specifically delineated
in the Dictionary of Occupational Titles, things like very
bright lights, the degree of social interaction, whether an
environment is predictable or not, whether people -- there's
crowds. So from where do you get your knowledge that these
jobs would fit all of my hypothetical limitations even those
that are not specifically delineated within the DOT?

A: It's based on my training, knowledge, and experience and
that would be in the capacity of analyzing the same or
similar Jobs or while working with employees in a
placement capacity.[109]

3.    The ALJ's Findings

The ALJ reasoned as follows:

The claimant's ability to perform work at all exertional
levels has been compromised by nonexertional limitations.
To determine the extent to which these limitations erode
the occupational base of unskilled work at all exertional
levels, the Administrative Law Judge asked the vocational
expert whether jobs exist in the national economy for an
individual with the claimant's age, education, work
experience, and residual functional capacity. The vocational
expert testified that given all of these factors the individual
would be able to perform the requirements of representative
occupations such as (1) Change-house attendant (DOT
358.687- 010), considered medium work according to the
Dictionary of Occupational Titles, with a specific vocational

---

[109] AR 1618-1621.

preparation of 2, with approximately 63,000 jobs available nationally; (2) Marker (DOT 209.587-034) considered light work according to the Dictionary of Occupational Titles, with a specific vocational preparation of 2, with 165,000 jobs available nationally; and (3) Assembler, small products I (DOT 706.684-022), considered light work according to the Dictionary of Occupational Titles, with a specific vocational preparation of 2, with approximately 20,000 jobs available nationally.

Although the vocational expert's testimony is inconsistent with the information contained in the Dictionary of Occupational Titles, there is a reasonable explanation for the discrepancy. The vocational expert explained, in testimony, the basis for his knowledge that the above identified jobs fit the hypothetical limitations that are not discussed in the DOT based on his 35 years of work experience as a vocational rehabilitation counselor, his training, his performing job analyses and actually placing individuals in these jobs.[110]

4.    <u>Analysis</u>

Plaintiff argues the following:

At Step Five, the Commissioner bears the burden to demonstrate that the claimant can perform other work that exists in significant numbers in the national economy, given the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1560(c)(2). This determination typically involves testimony from a VE in response to a hypothetical mirroring the claimant's RFC. Importantly, the ALJ must ensure that the VE's testimony is reliable and consistent with the DOT, SSR 00-4p, 2000WL 1898704. Under 00-4p, the ALJ has an "affirmative responsibility" to inquire about

---

[110] AR 1584-1585.

and resolve any apparent conflicts between the VE's testimony and the DOT job information.  If an apparent conflict exists (even if not flagged by the VE or claimant's attorney), the ALJ must as the VE to explain it, and then determine whether to accept the VE's explanation.[111]

Plaintiff then goes on to assert that the three jobs identified by the VE have unresolved discrepancies.[112] As the first job identified, that of "charge-house attendant" Plaintiff asserts that the ALJ never asked the VE whether there were crowds to be expected in the workplace.

The Court concludes on  the basis of the hearing transcript that Plaintiff errs.  The ALJ specifically questioned the VE as to whether the jobs would require Plaintiff to work in the presence of a crowd and the VE stated that in his experience the jobs did not require that.[113] Plaintiff offers no conflicting VE testimony or proof other than her own

---

[111] ECF No. 8, pg. 12.

[112] *Id*. at 14-15.

[113] AR 1621.

non-expert assertion that the position "appears" to require that the individual work in crowds.  Here, the ALJ specifically queried the VE as to the issue and accepted his testimony that based on his years of experience the job would fit within the hypothetical given by the ALJ.

Plaintiff next asserts that the job of "marker" is a "production-type" job and that it therefore would not fit within the hypothetical which limited Plaintiff from "assembly-line pace" or "fast-paced work." The Court notes that again, Plaintiff does not specify any actual information contained in the DOT that indicates the position is a production rate job, nor again does she offer any conflicting opinion from a qualified vocational expert.  Instead, Plaintiff relies upon the vague assertion that many such positions "have a certain number of items to be tagged per hour – which could be considered production-paced."[114]

The Court concludes that without evidence or a conflicting professional opinion that the ALJ erred in relying upon the VE's testimony the Court cannot find the ALJ to have committed error in

_____

[114] ECF No. 8.

doing so based solely on Plaintiff's non-expert assertions.  The simple fact that a job is a "production-type" job does not necessarily lead to the conclusion that it is "fast-paced."  There is nothing in the DOT that indicates that the position of marker is "fast-paced."

With regard to the last of the three jobs identified, that of a small products assembler, Plaintiff argues that because the job is to be performed on an assembly line it is inherently to be performed at an "assembly-line pace." But the DOT is not as clear as Plaintiff asserts. The position is one performed "as part of an assembly group."

The Court agrees with the Commissioner that even if the third position identified is performed on an assembly-line and the Court were to accept Plaintiff's argument that it is thus performed at "assembly-line pace" this is not consequential error, because the two prior positions identified constitute a substantial number of jobs available in the national economy, with a total of 228,000 for the two jobs.

In this instance, the Court concludes that the ALJ properly considered the VE testimony and found that there were a substantial

number of jobs available in the national economy that fit within Plaintiff's RFC.

The Court declines to remand as to this issue.

5.    Summary

It is the ALJ's responsibility to review and evaluate the conflicting evidence.[115] The ALJ queried the VE as to any potential conflict between his testimony and the DOT and meaningfully explained why she accepted the VE's testimony that he resolved the conflicts on the basis of his professional experience and judgment.

### IV.    Conclusion

Accordingly, **IT IS HEREBY ORDERED**:

1.    The ALJ's nondisability decision is **AFFIRMED**.

2.    The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 8 and 9**, enter **JUDGMENT** in favor of **Defendant**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

---

[115] *Tackett v. Apfel*, 180 F.3d 1094, 1102 (9th Cir. 1999).

1    DATED this 9th day of July 2025.

2

3    _____
     EDWARD F. SHEA
4    Senior United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23